**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| FEDERAL NATIONAL MORTGAGE ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) | No. 14-cv-04664 |
| v. | ) ) | Judge Andrea R. Wood |
| GEORGE L. OBRADOVICH, et al., | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Defendants and Counter-Plaintiffs George and Jennifer Obradovich (together, "the Obradoviches") owned a single-family home in Villa Park, Illinois, which they rented out to tenants. After evicting their last tenants for failing to pay rent, the Obradoviches could no longer make their own house payments and defaulted on their mortgage loan. They claim that their mortgagee, Federal National Mortgage Association ("Fannie Mae"), through its loan servicer Seterus Inc. ("Seterus"), hired contractors Safeguard Properties, LLC ("Safeguard") and YJM Development ("YJM") to enter illegally and winterize the home, botching the job and damaging the home in the process. Fannie Mae initiated this action to foreclose on the Obradoviches' mortgage; in response, the Obradoviches asserted counterclaims against Fannie Mae, Seterus, Safeguard, and YJM (collectively, "Counterclaim Defendants") for entering and damaging their home. Now before the Court are Fannie Mae's motion for summary judgment to foreclose on the house (Dkt. No. 182), and Fannie Mae and Seterus's motion for summary judgment as to the counterclaims (Dkt. No. 186), Safeguard's motion for summary judgment as to the counterclaims (Dkt. Do. 184), and YJM's motion for summary judgment as to the counterclaims (Dkt. No. 180).

## FACTUAL BACKGROUND

Unless otherwise indicated, the following facts taken from the parties' summary judgment filings are undisputed.

This matter concerns real property located at 920 S. Summit Avenue in Villa Park, Illinois ("Property"). On May 26, 2009, the Obradoviches executed and delivered a promissory note in the original principal amount of $205,450 ("Note") to Bank of America, Fannie Mae's predecessor in interest, to finance their purchase of the Property. (Obradoviches' Resp. to Fannie Mae's Statement of Material Facts ("ORSOMF") ¶ 1, Dkt. No. 194.) The Note was secured by a mortgage on the Property. (*Id.* ¶ 3.) But the Obradoviches stopped making payments after August 2013, and by September 2013, the Note and Mortgage were in default. (Fannie Mae's Statement of Material Facts ("Fannie Mae SOMF") ¶ 7, Dkt. No. 168; ORSOMF ¶ 5.) The Obradoviches attempted to avoid foreclosure by seeking a short sale of the Property and placed it on the market on October 9, 2013. (Fannie Mae's Resp. to Obradoviches' Consolidated Statement of Additional Material Facts ("Fannie Mae RSOMF") ¶ 1, Dkt. No. 217.) On October 16, 2013, the Obradoviches accepted an offer for the Property. (*Id.* ¶ 3.)

Seterus acquired servicing rights for the mortgage loan ("Loan") from Bank of America on November 1, 2013. (Obradoviches' Statement of Additional Material Facts ("OSOAMF") ¶ 4, Dkt. No. 206.)[1] As part of its efforts to oversee loans, Seterus would order monthly property inspections on all loans 45 or more days past due, until the loans were current or otherwise resolved. (Fannie Mae RSOMF ¶ 5.) Seterus retained Safeguard, an independent subcontractor, to provide property preservation services. (Fannie Mae SOMF, Ex. D., Lee Dep. at 17:8–12.) In practice, Safeguard further outsourced this type of work, including property inspections, to local

---

[1] Loan servicers are generally responsible for sending out monthly statements and monitoring mortgage payments. *See Gburek v. Litton Loan Serv. LLP*, 614 F.3d 380 (7th Cir. 2010).

independent subcontractors. (Fannie Mae SOMF, Ex. G, Meyer Dep. at 12:8–10, 14:23–15:8.) Fannie Mae also published a guide for its servicers that performed property preservation work ("Property Preservation Guide"). (OSOAMF ¶¶ 20–22.) The Obradoviches contend that Fannie Mae and Seterus required their contractors to follow the guidelines in the Property Preservation Guide when preserving properties. (OSOAMF, Ex. 1-C at 2, 8.) But Seterus contends that it did not control how contractors fulfilled its work orders. (Fannie Mae RSOMF ¶ 20.)

On November 13, 2013, Jennifer Obradovich informed Seterus that the Obradoviches were doing a short sale on the Property. (Fannie Mae RSOMF ¶ 7.) Nevertheless, on December 3, 2013, Seterus sent the Obradoviches a notice of intent to foreclose on the Property. (*Id.* ¶ 13.) On December 9, 2013, the Obradoviches submitted to Seterus an application for approval of a short sale in the amount of $155,000. (Defendants Obradoviches' Statement of Material Facts in Resp. to Plaintiff Fannie Mae's Mot. for Summ. J. ("DOSOMF") ¶¶ 18, 20, Dkt. No. 132.)

On January 2, 2014, a subcontractor hired by Safeguard visually inspected the Property and determined it was vacant, noting that the inside of the Property appeared empty with no personal property visible and the snow had not been shoveled. (Fannie Mae SOMF, Ex. G, Meyer Dep. at 165:21–166:21.) Sometime in January 2014, Fannie Mae and Seterus ordered Safeguard to change the locks at the Property and winterize it. (DOSOMF ¶ 21, Dkt. No. 132.) Winterizing a property involves preparing the plumbing for freezing temperatures that might cause leaks or breaks. On January 22, 2014, Safeguard requested permission from Seterus to secure the Property. (Fannie Mae RSOMF ¶ 16.) Safeguard then retained YJM, an independent subcontractor, to winterize the Property. (Safeguard's Statement of Material Facts ("Safeguard SOMF") ¶ 26, Dkt. No. 162.)

YJM inspector Michael Cornell entered the Property on January 25, 2014 to change the locks and winterize the house, a task that involved draining the heating system and putting antifreeze in it, confirming that the main water supply was turned off, blowing out the lines to rid them of any excess water, securing the main water valve with a zip tie, and completing a pressure test to ensure there were no leaks. (YJM's Statement of Material Facts ("YJM SOMF") ¶ 25–26, Dkt. No. 159.). The Obradoviches contend that Cornell failed to drain the hot water heater pipes properly. (OSOMF ¶ 74.) As a result, water left in the radiators froze, causing pipes to burst and water to seep out onto the floor of the house. (OSOMF ¶ 83.) For his part, Cornell cannot recall the specific actions he took to winterize the Property. (Fannie Mae SOMF, Ex. H, Cornell Dep. at 88:21–89:5.)

During a property inspection on March 12, 2014, Amy Morrison, a Safeguard vendor, observed standing water in the Property's living room. (Fannie Mae RSOMF ¶ 68.) Debbie Obradovich, the Obradoviches' realtor and the ex-sister-in-law of George Obradovich, visited the Property on March 17, 2014 to show it to the short-sale purchasers and discovered that the lock on the front door had been changed and the lockbox she had placed there was missing. (Fannie Mae SOMF, Ex. 2, G. Obradovich Dep. at 16:4–9; OSOAMF, Ex. 3., D. Obradovich Dep. at 31:23–33:1, Dkt. No. 206.) She was not able to enter the Property. (OSOAMF ¶ 70.) Jennifer Obradovich called Seterus to obtain the codes to the new lockbox. (OSOAMF ¶ 71.) Debbie Obradovich revisited the house after receiving the codes and observed water damage on the living room floor, which she contends she instantly recognized as the result of the hot water heater pipes being drained improperly. (OSOAMF ¶¶ 72–74; OSOAMF, Ex. 3, D. Obradovich Dep. at 38:4–19, Dkt. No. 206.)

The Obradoviches subsequently asked a friend, Scott Eickelmann, to visit the Property and remove some of the Obradoviches' personal property. (Fannie Mae RSOMF ¶ 76.) Eickelmann did so on March 17, 2014, and while there, he observed a puddle of water eight feet wide on the floor, damaged flooring, damaged radiators, mold, and insulation (originally from the living room floor) in the basement. (Fannie Mae RSOMF ¶¶ 78–79, 81–82.) At George Obradovich's request, Eickelmann turned on the water to check for further damage to the plumbing. (Fannie Mae RSOMF ¶ 84.) After Eickelmann did so, water came out of the radiators; Eickelmann then shut off the water and cleaned up the resulting puddle. (Fannie Mae RSOMF ¶¶ 86–88.)

Jennifer Obradovich called Safeguard to ask if the water damage would be repaired. (Fannie Mae RSOMF ¶ 94.) On March 20, 2014, Safeguard dispatched Bart Lynam[2] to the Property to complete the winterization and have the water cut off at the street. (Fannie Mae RSOMF ¶ 95.) Lynam concluded that someone had turned the water back on in the house, which reintroduced water into the system. (OSOAMF, Ex. 5, Lynam Dep. at 115:12–116:5, Dkt. No. 206.) He also found that the gate valves, which kept water from flowing through the pipes, were not closed. (*Id*. at 116:5–10.) If those valves failed, the city would need to turn off the water at the curb to stop water from flowing through the system; turning off the water at the house alone would not stop it. (*Id*. at 116:11–118:2.) Lynam mopped up the pooled water he found, capped the water lines with the assistance of the city to stop water flowing into the system, and submitted a bid estimating the water damage at $15,000 and the plumbing repair costs at $1,800. (Fannie Mae RSOMF ¶¶ 102–03.) The parties dispute whether the water damage Lynam observed was the result of an improper winterization.

---

[2] Lynam worked for Foreclosure Preservation Corporation, a contractor retained by Safeguard. (Fannie Mae SOMF ¶ 34.)

5

Safeguard declined the claim for damage to the Property by April 9, 2014. (*Id.* ¶ 105.) On May 23, 2014, Jennifer Obradovich spoke with Seterus about the claim and told Seterus that Safeguard needed Seterus's approval for the claim. (*Id.* ¶ 106.) Because Seterus considered the allegation of improper winterization to be Safeguard's problem, it did not investigate and instead told the Obradoviches that it did not consider itself liable for Safeguard's actions. (*Id.* ¶¶ 107–09.) Mold then began to spread in the Property, and in June 2014, Lynam submitted a bid of $5,037.50 to install a dehumidifier and remediate mold damage. (*Id.* ¶¶ 111–12.) Yet none of the Counterclaim Defendants made any attempt to repair the Property. (*Id.* ¶¶ 115–17.)

Meanwhile, the Obradoviches and Fannie Mae continued to correspond regarding the short-sale offer. After Fannie Mae asked the Obradoviches to raise their short-sale price to $165,000 on February 24, 2014, it accepted a counteroffer from the buyers for $160,000. (DOSOMF ¶ 24.) On March 10, 2014, Fannie Mae approved the short sale. (DOSOMF ¶ 24.) However, after the buyers discovered the damage to the Property, they reduced their short-sale offer to $135,000. (DOSOMF ¶ 31.) The Obradoviches submitted a property value dispute to Fannie Mae and applied for a short sale at the buyers' offer of $135,000. (DOSOMF ¶ 33.) The Obradoviches contend that Fannie Mae failed to acknowledge the offer or repair the damage to the Property by the April 25, 2014 closing date, and so the short sale did not take place. (DOSOMF ¶ 34.) On May 22, 2014, Fannie Mae informed the Obradoviches that the short-sale offer was denied. (DOSOMF ¶ 37.)

On March 25, 2014, Fannie Mae filed a foreclosure action in Illinois state court regarding the Property. (Notice of Removal ¶ 1, Dkt. No. 1.) The Obradoviches removed the action to federal court on June 20, 2014, filed their Answer and Counterclaim on July 23, 2014 (Dkt. No. 14), and filed their First Amended Counterclaim (Dkt. No. 97) on April 12, 2016. The

Obradoviches assert the following counterclaims against all Counterclaim Defendants: trespass (Count I), violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq*. (Count II), and negligence (Count III). Against Seterus, Safeguard, and YJM, the Obradoviches also assert claims for violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*. (Count IV). Fannie Mae now moves for summary judgment on its claim for foreclosure (Dkt. No. 182), and the Counterclaim Defendants move for summary judgment as to all the Obradoviches' claims against them (Dkt. Nos. 180, 184, 186).

## DISCUSSION

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Gross v. PPG Indus., Inc.*, 636 F.3d 884, 888 (7th Cir. 2011). When considering a summary judgment motion, the Court draws all reasonable inferences from the evidence in favor of the nonmoving party. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010). To defeat the motion, the nonmovant must come forward with sufficient evidence from which a reasonable factfinder could find in his or her favor. As the Seventh Circuit has explained, "[s]ummary judgment is 'not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.'" *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory,* 407 F.3d 852, 859 (7th Cir. 2005)). "[The Court] must assume the truth of the non-moving party's evidence on summary judgment, but that duty 'does not extend to drawing inferences that are supported by only speculation or conjecture.'" *Swetlik v. Crawford*, 738 F.3d 818, 829 (7th Cir. 2013). The same standard applies to cross-motions for summary judgment.

*See, e.g.*, *Int'l Bd. Of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). "Each motion is to be evaluated independently, and denial of one does not necessitate the grant of the other." *Dominguez v. Quigley's Irish Pub, Inc.*, 790 F. Supp. 2d 803, 810 (N.D. Ill. 2011).[3]

## I.  Fannie Mae's Foreclosure Claim

"[F]ederal courts in diversity cases (and any other cases in which state law supplies the rule of decision) apply state 'substantive' law but federal 'procedural' law." *Gacek v. Am. Airlines, Inc.*, 614 F.3d 298, 301–02 (7th Cir. 2010). In this case, the Court applies the substantive law of Illinois. Under the Illinois Mortgage Foreclosure Law, 735 ILCS 5/15–1501 *et seq.*, a mortgage is defined as "any consensual lien created by a written instrument which grants or retains an interest in real estate to secure a debt or other obligation," 735 ILCS 5/15–1207, and "to foreclose" means "to terminate legal and equitable interests in real estate pursuant to a foreclosure." 735 ILCS 5/15–1203. Illinois law requires that a copy of the Note and Mortgage be attached to the complaint in a mortgage foreclosure action. 735 ILCS 5/15–1504. Accordingly, "a *prima facie* case for foreclosure is established with the introduction of the mortgage and the note, after which the burden shifts to the mortgagor to prove any affirmative defenses." *Kondaur Capital Corp. v. Sreenan*, No. 1–12–2711, 2013 WL 6869788, at *6 (Ill. App. Ct. Dec. 30, 2013); *see also* 735 ILCS 5/15-1504(a)(2).

Here, it is undisputed that the Obradoviches executed and then defaulted under the terms of the Note and Mortgage. (ORSOMF ¶¶ 1, 3, 16.) Fannie Mae attached a copy of the Mortgage

---

[3] The Obradoviches spend much of their briefs complaining that Fannie Mae failed to comply with the local rules by submitting a statement of material facts alongside its original motion for summary judgment. N.D. Ill. Local Rule 56.1(a). The Court addressed this issue on the record by expressly granting leave for the parties to supplement their briefings to come into compliance with the Local Rules. (Dkt. No. 187.) Accordingly, the matter has been resolved.

and the Note to the Complaint and as exhibits to Fannie Mae's statement of material facts. Moreover, the operative terms of the Note and Mortgage are unambiguous. The Note defines a default as a failure to pay "the full amount of each monthly payment on the day it is due." (Note at 1, Compl., Dkt. No. 1-1.) The Mortgage states that it secures repayment of the Loan, which is defined as "the debt evidenced by the Note, plus interest." (Mortgage at 3, Compl., Dkt. No. 1-1.) The Mortgage further states that in the event of a default, the Note Holder may require immediate payment of the full amount of the unpaid principal and all interest owed on that amount. (Note at 2, Compl., Dkt. No. 1-1.) Fannie Mae thus has established a *prima facie* case for foreclosure.

In opposing summary judgment, the Obradoviches argue that Fannie Mae has failed to address their affirmative defenses. Those affirmative defenses include the claim that, "to the extent that Plaintiff does not hold the original 'blue ink' promissory note, Plaintiff lacks standing to foreclose;" as well as assertions that damages are barred by the equitable doctrines of laches, unclean hands, waiver, or estoppel; that any injury to Fannie Mae is a result of Fannie Mae's own conduct, specifically, a failure to conduct affairs in good faith or comply with the Making Home Affordable Program or Home Affordable Foreclosure Alternatives programs; and that damages are barred by a failure to mitigate them. (Answer at 6–7, Dkt. No. 11.)

The Obradoviches' reliance on these affirmative defenses to defeat summary judgment fails, however, for the simple reason that they have not pointed to any evidence in the record to establish a triable issue of material fact as to any of them. The Obradoviches, as the defendants, not Fannie Mae, as the plaintiff, bear the burden of proving any affirmative defenses. *See, e.g.*, *Equal Emp't Opportunity Comm'n v. AutoZone, Inc.*, 707 F.3d 824, 831–32 (7th Cir. 2013) (because issue preclusion is an affirmative defense, the party asserting it bears the burden of

proof). The Obradoviches cannot rest on their pleadings alone but must produce evidence to show that any of their affirmative defenses present an issue for trial. They have failed to present any such evidence.

The Obradoviches also attack the sufficiency of the affidavits Fannie Mae attaches in support of its request for foreclosure: an affidavit attesting to the amount owed on the Loan and a loss mitigation affidavit attesting to Fannie Mae's compliance with applicable loss mitigation programs.[4] (Pl.'s Mot. for Summ. J, at 14, 93, Dkt. No. 125.) The Obradoviches contend that the affidavits are merely boilerplate documents unsupported by evidence and not based on personal knowledge. Indeed, supporting affidavits do need to be based on personal knowledge. *See* Fed. R. Civ. P. 56(c)(4). Here, however, both affiants work as document management specialists for Seterus, a role that requires them to be familiar with the practices and procedures of Fannie Mae and Seterus. Both affiants state that they have worked with the business records at issue in this very case. And both identify and attach copies of the documents they relied upon in creating their affidavits. In sum, the affidavits are grounded in observation and personal experience as required by Federal Rule of Civil Procedure 56(c)(4). *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991).

Finally, the Obradoviches contend that Fannie Mae should be denied summary judgment on their foreclosure claim because they have failed to address the Obradoviches' counterclaims.

---

[4] Illinois Supreme Court Rule 114(a) provides that a plaintiff in a foreclosure action must show that it has complied with any applicable loss mitigation programs before moving for a judgment of foreclosure. Ill. Sup. Ct. R. 114(a). Fannie Mae acknowledges in its reply brief that it filed the affidavits to show compliance with Rule 114(a). The affidavit specifies the type of loss mitigation applicable to the Mortgage, the steps taken to offer a loss mitigation program to the Obradoviches, and the status of those mitigation efforts. *Wells Fargo Bank, N.A. v. Smith*, 125 N.E. 3d 1241, 1245 (Ill. App. Ct. 2019). The affidavit thus satisfies the requirements of the Rule. That Fannie Mae used a fill-in-the-blank template in constructing the affidavit does not, as the Obradoviches contend without support, indicate that Fannie Mae failed to comply with the substantive requirements of the Rule.

That argument fails as well. Whether the Obradoviches have defaulted on their mortgage loan is a matter independent from whether the Obradoviches may pursue monetary damages for their claims of trespass, negligence, and violation of various Illinois consumer protection acts

In short, the Obradoviches have not demonstrated a genuine issue of fact with respect to Fannie Mae's foreclosure action. Accordingly, Fannie Mae's motion for summary judgment on that claim is granted.

## II.     The Obradoviches' Counterclaims

The Court now turns to the Counterclaim Defendants' motions for summary judgment on the various counterclaims.

### A.     Trespass

In Count I of their Counterclaim, the Obradoviches assert claims against all the Counterclaim Defendants for trespass. Under Illinois law, "[a] trespass is an invasion of the interest in the exclusive possession of land, as by entry upon it." *In re Chi. Flood Litig.*, 680 N.E.2d 265, 277 (Ill. 1997) (internal quotation marks omitted). "To sustain a cause of action for trespass to real property, a plaintiff must allege a wrongful interference with his actual possessory rights in the property." *Loftus v. Mingo*, 511 N.E.2d 203, 210 (Ill. 1987). Someone may be liable for an intrusion by a third party "if he acts with the knowledge that his conduct will, with a substantial degree of certainty, result in the intrusion." *Dietz v. Ill. Bell Tel. Co.*, 507 N.E. 2d 24, 26 (Ill. App. Ct. 1987). In addition, a person who aids, abets, assists, or directs the commission of a trespass by another is therefore liable for that trespass. *Id*.

The Obradoviches assert that Fannie Mae and Seterus directed Safeguard or its contractors to enter the Property forcibly and in reckless disregard for the Obradoviches' property rights. Indeed, it is undisputed that YJM entered the Obradoviches' property at

11

Safeguard and Fannie Mae's behest, performed at least a partial winterization, and changed the lock on the front door of the house, thus interfering with the Obradoviches' possessory rights. The question, then, is whether any reasonable factfinder could conclude that this interference was wrongful.

The Counterclaim Defendants contend that any interference with the Obradoviches' possessory rights in the Property was necessarily proper because the Obradoviches expressly consented to that sort of entry. Section 9 of the Mortgage provides that if the borrowers (*i.e.*, the Obradoviches) fail to perform their obligations under the Mortgage or abandon the Property, the lender is entitled to do "whatever is reasonable or appropriate to protect [the lender's] interest in the Property." (Mortgage § 9, Compl., Dkt. No. 1-1.) Such reasonable or appropriate actions would include "securing and/or repairing the Property." *Id*. The Obradoviches, however, contend that they never abandoned the Property, and so Fannie Mae did not act reasonably or appropriately in entering the property and performing a winterization.

In Illinois, mortgagees have the option of seeking an expedited judgment and sale when residential property has been abandoned. *See* 735 ILCS 5/15-1505.8. The Obradoviches do not dispute that they were not using the Property as a permanent residence. But for residential property to be considered abandoned, it must also satisfy at least two conditions from a list of eleven set out by Illinois statute. *See* 735 ILCS 5/15-1200.5 (setting forth the definition of an "abandoned" residential property and listing eleven criteria that demonstrate abandonment). Such conditions include that the residential property has multiple closed off or smashed windows; it has broken or continuously unlocked doors; gas, electrical, or water services have been terminated; or the mortgagor has indicated in a written statement a clear intent to abandon the property. *Id*.

12

The Counterclaim Defendants make no effort to show that any of the statutory factors applied to the Property. While the Counterclaim Defendants contend that the Obradoviches abandoned the Property, the only evidence they offer in support of that assertion is that no one was living in the Property after September 2013, neither of the Obradoviches stepped foot in the Property in 2014 or had knowledge of the interior of the house, the snow was not shoveled at the time of an inspection, and personal property was not visible through the windows. Illinois law, however, has specific requirements for a residential property to be considered abandoned and the undisputed evidence does not meet those requirements. Notably, the Obradoviches contend that they never professed an intent to abandon the Property, and the parties do not dispute that the Obradoviches must have had *some* personal property in the house, as Scott Eickelmann removed personal property sometime after the Counterclaim Defendants purportedly determined that the Property had been abandoned. Based on the arguably conflicting evidence, a reasonable jury could conclude that the Obradoviches had not abandoned the Property and that the Counterclaim Defendants violated the Obradoviches' possessory interest in the Property by trespassing to perform an unwanted winterization.

Even assuming that there was an unlawful trespass, Fannie Mae, Seterus, and Safeguard contend that they cannot be held liable for it because the persons who entered the Property were not their agents. The doctrine of *respondeat superior* allows a principal to be held liable for the tortious actions of agents under the principal's control. *Lawlor v. N. Am. Corp. of Ill.*, 983 N.E.2d 414, 427 (Ill. 2012). The determination of whether a particular individual or entity acted as the agent of another is factually intensive and turns primarily on the extent of the control that the alleged agent retained over the performance of its work. *Horwitz v. Holabird & Root*, 816 N.E.2d 272, 279 (Ill. 2004). "The test of agency is whether the alleged principal has the right to

control the manner and method in which work is carried out by the alleged agent and whether the alleged agent can affect the legal relationships of the principal." *Anderson v. Boy Scouts of Am., Inc.*, 589 N.E.2d 892, 894 (Ill. 1992). Other relevant factors include "(1) the question of hiring; (2) the right to discharge; (3) the manner of direction of the servant; (4) the right to terminate the relationship; and (5) the character of the supervision of the work done." *Lawlor*, 983 N.E.2d at 427. Notably, while an independent contractor typically works to produce a particular result but in performing that work is permitted to use "discretion in things not specified," *Horwitz*, 816 N.E.2d. at 279, the fact that the tortfeasor was an independent contractor does not bar liability for the principal where an agency relationship nonetheless exists. *Petrovich v. Share Health Plan of Ill., Inc.*, 719 N.E.2d 756, 765 (Ill. 1999).

Here, Fannie Mae and Seterus contend that they did not supervise subcontractors such as Safeguard and YJM, direct their hiring practices, or otherwise direct the performance of their duties; thus, Safeguard and YJM were not agents of Fannie Mae or Seterus and the latter entities cannot be held responsible for the former's actions. The Obradoviches, on the other hand, point out that Fannie Mae developed the guidelines in the Property Preservation Guide to control the manner or method by which its subcontractors carried out property preservation. The Property Preservation Guide specifically states that it is "intended for use when preserving vacant properties for mortgage loans that are in default." (OSOAMF, Ex. 1-C at 77, Dkt. No. 206.) And it details procedures for confirming vacancy, changing locks, and shutting off water, which are described as "[s]pecific server requirements." (OSOAMF, Ex. 1-C at 78.)

Fannie Mae and Seterus dispute the Obradoviches' characterization of the Property Preservation Guide. But the Property Preservation Guide does appear to provide strict requirements for how property preservation services should be carried out by contracted vendors.

14

With respect to winterization, for example, the vendor must shut off the water source at both the curb and the main interior water supply, drain all plumbing and heating systems, and complete the winterization process within a specific timeframe. (OSOAMF, Ex. 1-C at 84.) While the effective date of the Property Preservation Guide in the record is November 12, 2014, Fannie Mae and Seterus do not claim that the guide is out of date or otherwise not representative of the standards Fannie Mae and Seterus set for their property servicers during the relevant time period. Whether the Property Preservation Guide, or something like it, governed Fannie Mae's and Seterus's relationships with YJM and Safeguard and effectively removed the latter's discretion is a disputed question of fact. Since a jury could conclude that a principal-agency relationship existed, with Fannie Mae or Seterus as a principal and YJM or Safeguard as an agent, Fannie Mae and Seterus's request for summary judgment on the trespass claim is denied.

The Court turns next to Safeguard, which was retained by Fannie Mae and Seterus for the purpose of retaining other local contractors to carry property preservation. Safeguard contends that it did not control the manner and method by which YJM and other subcontractors performed their tasks and so Safeguard cannot be held liable as principal to YJM's agent. With respect to the Property Preservation Guide, Safeguard contends that any guidelines contained within it do not apply to the issue at hand. Safeguard further argues that it hires independent contractors to perform certain tasks because those subcontractors were experts on those tasks. As evidence, Safeguard points to the testimony of YJM employee Cornell, who, when asked if "[Safeguard] wouldn't necessarily know how someone went about [winterizing a property]?" responded "Correct." (Safeguard SOMF, Ex. 10, Cornell Dep. at 106:4–17, Dkt. No. 162.) But Cornell's testimony does not exclude the possibility that Safeguard nonetheless required subcontractors to follow the Property Preservation Guide or some other guidelines. Such a practice would not be

15

inconsistent with Cornell's testimony—Safeguard could certainly demand that contractors follow specific guidelines without knowing precisely how a contractor performed the finer details of a given task. Moreover, Fannie Mae and Seterus assert that Safeguard was responsible for the winterization process (and thus for any consequences). In sum, there is a dispute of fact as to whether Safeguard controlled the process by which YJM performed its work such that YJM should be considered Safeguard's agent. Thus, Safeguard's motion for summary judgment as to the trespass claim is denied as well**.**

### B.    Illinois Consumer Fraud and Deceptive Business Practice Act

The ICFA protects consumers "against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 669 (7th Cir. 2008). The ICFA's protections are generally limited to consumers, defined as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use or that of a member of his household." 815 ILCS 505/1(e). The statute addresses both deceptive and unfair business practices. To establish an ICFA claim based on deceptive conduct, the plaintiff must prove the following elements: "(1) the defendant committed a deceptive act or practice; (2) the defendant intended for the plaintiff to rely on the deception; (3) the deception happened in the course of trade or commerce; and (4) the deception proximately caused the plaintiff's injury." *Cocroft v. HSBC Bank USA, N.A.*, 796 F.3d 680, 687 (7th Cir. 2015). A showing of actual reliance is not required. *Id.* Meanwhile, three considerations guide a court's determination of whether conduct qualifies as unfair under the ICFA: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes

substantial injury to consumers." *Windy City MetalFabricators & Supply, Inc.*, 536 F.3d at 669. However, "[a] court may find unfairness even if the claim does not satisfy all three criteria." *Id.*

The Obradoviches claim that the Counterclaim Defendants violated the ICFA by locking them out of the Property without telling them, even though they were in the process of selling the home, and intentionally causing or failing to repair damage to the Property to bully the Obradoviches into an expedited foreclosure process. The Obradoviches claim that as a result of this conduct, they lost the short sale and were left with a damaged Property. For their part, Fannie Mae and Seterus attempt to disclaim liability by contending that they were not actively involved in any alleged deception or unfair practice. But the Obradoviches contend that Fannie Mae and Seterus instructed Safeguard to winterize and change the locks on the Property, did not repair damage from the allegedly botched winterization, and refused to accept a reduced short-sale offer to account for the damage. All those actions implicate the direct involvement of Fannie Mae and Seterus.

As Fannie Mae and Seterus correctly observe, the Obradoviches point to no evidence in support of their contention that the Property was intentionally damaged. Nor do the Obradoviches offer evidence suggesting that Fannie Mae and Seterus engaged in a deception in refusing to honor what the Obradoviches saw as an obligation to repair the Property. The cited deposition testimony suggests only that Fannie Mae and Seterus refused to repair the Property, that they believed Safeguard was responsible for any repairs, and that a short sale did not take place because the reduced offer was not accepted. (Fannie Mae SOMF, Ex. D., Lee Dep. at 100:7–14, 100:23–101:5.) The original notice of foreclosure had been sent well before the winterization effort, and the Obradoviches were well aware that they were not making payments on the Loan. That Fannie Mae chose to file an action to foreclose the Property is, without

17

contrary evidence, not surprising. In sum, the Obradoviches must offer something more to support the idea that Fannie Mae and Seterus committed a deceptive act and intended for the Obradoviches to rely upon that conduct.

The Obradoviches' unfair conduct theory fares better. As noted above, to determine whether a practice is unfair under the ICFA, the Court asks whether the practice offends public policy, is immoral, oppressive, or unscrupulous, or causes substantial injury to the consumer. *Windy City Metal Fabricators & Supply, Inc.*, 536 F.3d at 669. The Seventh Circuit has provided that in determining whether conduct meets that standard, "the relevant inquiry is whether a defendant's conduct is so oppressive as to leave the consumer with little alternative except to submit to it." *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) (quoting *Robinson v. Toyota Motor Credit Corp.,* 775 N.E.2d 951, 961 (Ill. 2002)) (internal quotation marks omitted). With respect to the present case, a jury could conclude that invading and modifying the property of a homeowner in the manner claimed by the Obradoviches was sufficiently oppressive. Because the Counterclaim Defendants changed the locks on the Property without the Obradoviches' consent, they had "little alternative except to submit to" the modifications. *Id.* Moreover, those actions caused injury to the Obradoviches in the form of a damaged house and lost short sale.

The Obradoviches have pointed to enough evidence in the record to create a dispute of material fact as to whether the Counterclaim Defendants' conduct was unfair. Summary judgment is therefore denied with respect to the ICFA claim to the extent it is predicated on unfair conduct.

18

### C.     Negligence

In Count III of their Counterclaim, the Obradoviches assert a claim for negligence against all the Counterclaim Defendants. Specifically, they contend that the Counterclaim Defendants failed to take reasonable steps to protect the Property after entering it, changing the locks, and winterizing it. They further claim that the Counterclaim Defendants failed to use reasonable care in selecting contractors, breached a duty to act by allowing and contributing to the destruction of the Property, and ignored their duty of reasonable care even though they knew their actions would likely injure the Obradoviches.

"To prove a defendant's negligence under Illinois law, a plaintiff must establish the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach." *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1022 (7th Cir. 2018). "Every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act." *Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1097 (Ill. 2012) (internal quotation marks omitted). As with the tort of trespass, the doctrine of *respondeat superior* provides an exception to the general rule that a person injured by the negligence of another must seek his remedy against the individual who caused the injury. *Sperl v. C.H. Robinson Worldwide*, 946 N.E.2d 463, 470 (Ill. App. Ct. 2011) ("Under the doctrine of *respondeat superior*, a principal may be held liable for the negligent actions of an agent that caused a plaintiff's injury, even if the principal does not himself engage in any conduct in relation to the plaintiff."). In addition, Illinois courts recognize "a duty to a third party to control the individual who is the source of the harm when a defendant has a special relationship with that person, such as a master-servant or employer-employee relationship." *Simpkins*, 965 N.E.2d at 1098.

As with the trespass claim, Fannie Mae, Seterus, and Safeguard contend that summary judgment should be granted in their favors because no agency relationships exist between them and the parties that actually trespassed on the Property. But as explained above, the Obradoviches have demonstrated the existence of a genuine issue of fact as to whether principal-agency relationships existed between Fannie Mae and Seterus as principals, on the one hand, and YJM and Safeguard as agents, on the other hand. *Sperl*, 946 N.E.2d at 471. Thus, summary judgment cannot be granted on that basis.

Whether or not the Counterclaim Defendants owed the Obradoviches a duty of care that was breached also presents a genuine dispute of material fact. The Obradoviches contend that Seterus recruited Safeguard, which in turn recruited YJM, to winterize the Property in violation of the guidelines set forth in the Property Preservation Guide promulgated by Fannie Mae. (OSOAMF, Ex. 1-C at 77, Dkt. No. 206.) The Obradoviches have adduced evidence that YJM damaged the Property by failing to drain all water from the plumbing system (OSOMF ¶ 74), and thereafter, Safeguard, Seterus, and Fannie Mae all refused to investigate, pay for the damage, or order the Property be repaired, which resulted in mold damage to the Property and the failure of the short sale that the Obradoviches had arranged (OSOMF ¶¶ 106, 109, 114–117). While the Counterclaim Defendants dispute that any of them were obligated to follow the Property Preservation Guide or were in any way responsible for causing or repairing the damage to the Property, the Obradoviches have provided enough evidence to show a dispute of fact exists. The Counterclaim Defendants' requests for summary judgment with respect to the negligence claims are therefore denied.

### D.     Fair Debt Collection Practices Act

Finally, in Count IV of their Counterclaim, the Obradoviches contend that Seterus, Safeguard, and YJM violated the FDCPA. The FDCPA prohibits debt collectors from pursuing abusive, deceptive, or unfair debt-collection practices. *See* 15 U.S.C. § 1692 *et seq*. Here, the Obradoviches contend that Seterus, Safeguard, and YJM violated the FDCPA in four ways: (1) they violated § 1692e by falsely claiming a right to enter the Property; (2) they violated § 1692d by facilitating the denial of the short-sale offer by damaging and refusing to repair damage done to the Property; (3) they violated § 1692f by using unfair means in trying to collect the Obradoviches' debt—namely, entering, changing locks, and engaging in property preservation services prematurely; and (4) they assessed unauthorized fees in violation of §§ 1692e, 1692f, and 1692g.

The Court begins with the last of the four alleged violations. The Obradoviches appear to have abandoned their claim asserting unauthorized collection of fees, as they make no mention of it during the briefing and offer no evidence in support of their allegations. It does appear that Seterus may have charged late fees in connection with missed payments on the Loan. (*See* OSOAMF Ex. B., Lee Dep. at 18:19–21, Dkt. No. 206.) But the Obradoviches offer neither argument nor evidence suggesting that those fees, or any other unspecified fees, were unauthorized or part of a wrongful debt-collection action. Accordingly, any such argument has been waived. *See, e.g.*, *Gburek v. Litton Loan Serv'g., LP*, 614 F.3d 380, 387 (7th Cir. 2010) (declining to address defendants' underdeveloped argument); *Buirge v. Berryhill*, No. 17-cv-5448, 2018 WL 4144621, at *2–3, (N.D. Ill. Aug. 30, 2018) (holding that plaintiff waived several arguments at the summary judgment stage because his briefing merely made undeveloped assertions without providing supporting caselaw or legal analysis).

21

Turning to the other three claims, the Court first considers whether any of Seterus, Safeguard, or YJM qualify as debt collectors under the FDCPA. The FDCPA defines a debt collector as any person who "uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts" or who "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). *See also Gburek*, 614 F.3d at 384. The Seventh Circuit, in another case involving Safeguard, recently clarified that property preservation alone does not constitute debt collection under the FDCPA. *See Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 468 (7th Cir. 2018). In *Schlaf*, a mortgage servicer contracted with Safeguard for the latter to perform occupancy inspections. Safeguard left door hangers on a doorknob outside the property providing instructions for the mortgagors to contact the mortgage servicers but it did not give any details about the debt or demand payment. *Id*. at 459. In finding that Safeguard was not a debt collector, the Seventh Circuit emphasized that limited, indirect action taken without reference to a debt is not sufficient to trigger the protections of the statute. *Id*. at 469 ("[T]he FDCPA is aimed at curbing abuses by third-party debt-collection agents who are much more involved in actual debt collection than Safeguard, whose primary purpose is property preservation.").

In this case, the undisputed evidence demonstrates that neither YJM nor Safeguard qualifies as a debt collector under the FDCPA. With respect to YJM, the parties agree that YJM entered the Property solely to perform a winterization and change locks, and never attempted to communicate with the Obradoviches regarding any subject. The Obradoviches do not point to any evidence suggesting that YJM was retained to collect money for the unpaid mortgage, did anything other than enter to secure the Property, or had debt-collecting as its principal purpose or

22

practice. As property preservation alone is not enough to make one a debt collector, YJM is entitled to summary judgment on the Obradoviches' counterclaim under the FDCPA.

Similarly, the Obradoviches have failed to adduce any evidence that Safeguard's conduct brings it within the purview of the FDCPA. The parties agree that Fannie Mae and Seterus contracted with Safeguard to provide property preservation services—specifically, winterization and changing of locks. Likewise, Safeguard's purpose in delegating those tasks to YJM was to preserve the Property. Safeguard did not involve itself in any attempt to collect a debt from the Obradoviches.

Nonetheless, the Obradoviches contend that because YJM and Safeguard relied on the Mortgage as authorizing their actions with respect to the Property, they are necessarily liable as debt collectors enforcing security interests. But none of the evidence suggests that YJM or Safeguard attempted to collect a debt owed under the Mortgage. YJM and Safeguard merely relied upon the Mortgage as authorization for entry into the Property—the Mortgage gave Fannie Mae and Seterus a right to enter or secure the Property under specific circumstances, and Fannie Mae and Seterus contracted with Safeguard, which subsequently contracted with YJM, to exercise that right on Fannie Mae's and Seterus's behalf. In short, YJM and Safeguard's roles in securing the Property are too remote and incidental to be considered debt collection. *See Schlaf*, 899 F.3d at 464.

Seterus, however, finds itself in a different position. The undisputed evidence establishes that Seterus acquired the debt owed by the Obradoviches and communicated with them regarding the amount owed. (Fannie Mae SOMF, Ex. D., Lee Dep. at 18:8–23.) Moreover, the parties agree that Seterus acquired servicing rights for the Loan after it was already in default. (Fannie Mae RSOMF ¶ 4.) *See Carter v. AMC, LLC*, 645 F.3d 840, 843 (7th Cir. 2011) (servicing agents

are not debt collectors under the FDCPA unless the debt was already in arrears). The Seventh

Circuit has held that the FDCPA "treats assignees as debt collectors if the debt sought to be

collected was in default when acquired by the assignee, and as creditors if it was not." *Schlosser*

*v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7th Cir. 2003).

The question, then, is whether Seterus's property preservation services were "in

connection with the collection of any debt" or in an effort "to collect or attempt to collect any

debt." 15 U.S.C. §§ 1692c, 1692f. *See also Gburek*, 614 F.3d at 384. Factors relevant to this

inquiry include the relationship between the parties and "the purpose and context of the

communication, judged by an objective standard." *Schlaf*, 899 F.3d at 467 (quoting *Gburek*, 614

F.3d at 385) (internal quotation marks and alterations omitted). Based on the record, a reasonable

jury could find that Seterus hired Safeguard to enter and winterize their Property to collect on a

debt. The Obradoviches and Seterus's relationship was one between debtors in default and debt

collector. And Seterus had already sent the Obradoviches a notice of intent to foreclose on the

Property when it directed Safeguard to change the locks—suggesting that Seterus was preparing

to take possession of and sell the Property, not merely protecting its interest in it. (Fannie Mae

RSOMF ¶ 13; DOSOMF ¶ 21.) Therefore, Seterus is not entitled to summary judgment on the

FDCPA claims based on its argument that it did not perform debt collection services.

The Obradoviches have also demonstrated a genuine dispute of fact as to whether Seterus

violated § 1692f(6) when it directed its contractor to enter the Property without permission,

change the locks, and winterize it prematurely. Section 1692f(6) prohibits debt collectors from

taking any nonjudicial action to dispossess the debtor of their property when the collector has no

present right to possess the property. 15 U.S.C. § 1692f(6). In determining whether a debt

collector had the right to possess a property, the Court looks to the applicable state self-help

repossession statute, which may be found at 810 ILCS 5/9–609. *See Barnes v. Nw. Repossession*

24

*LLC*, 210 F. Supp. 3d 954, 961 (N.D. Ill. 2016). Section 9-609(b)(2) permits a secured party to repossess its collateral after a default only if such repossession does not constitute a breach of the peace.

In this case, the parties do not dispute that Seterus was a secured party and that the Obradoviches were in default, so the only element at issue is whether Seterus breached the peace when it entered the Property. Illinois courts applying § 9-609(b)(2) have held that mere trespass is not necessarily enough to constitute a breach of the peace, but a trespass may breach the peace if it involves cutting through or breaching a door, gate, barricade, or other entryway. *Thompson-Young v. Wells Fargo Dealer Servs., Inc.*, 2014 IL App (1st) 132479-U ¶ 16 (Ill. App. Ct. 2014). *See also Pantoja-Cahue v. Ford Motor Credit Co.*, 872 N.E.2d 1039, 1046 (Ill. App. Ct. 2007) (breaking into debtor's locked garage to repossess his car amounted to a breach of the peace). *But see Chrysler Credit Corp. v. Koontz*, 661 N.E.2d 1171, 1173–75 (Ill. App. Ct. 1996) (debt collector's trespass onto debtor's front yard to repossess his car was insufficient to constitute a breach of the peace). Here, a reasonable jury could find that the circumstances under which Seterus told its agent to go inside the Property without permission resulted in a breach of the peace and therefore violated 15 U.S.C. § 1692f(6). Seterus's motion for summary judgment as to § 1692f is therefore denied.[5] But because the Obradoviches' briefing fails to develop any arguments that Seterus violated §§ 1692d and 1692e, Seterus is entitled to summary judgment as to claims brought under those sections. *See Gburek*, 614 F.3d at 387.

---

[5] The Obradoviches argue that Seterus is not entitled to assert the bona fide error defense to any FDCPA claims under 15 U.S.C. § 1692(k)(c). (Obradoviches' Consolidated Resp. and Mem. in Opp'n to Summ. J. at 29, Dkt. No. 205.) But as Seterus concedes, it has not raised such a defense as a basis for granting summary judgment. (Reply in Supp. of Fannie Mae and Seterus's Mot. for. Summ. J. at 23, Dkt. No. 216.) Therefore, the Court declines to address the issue.

In sum, since Safeguard and YJM's actions were not inherently associated with collecting a debt, the Court grants summary judgment in their favor with respect to Count IV. But because Seterus may qualify as a debt collector under the FDCPA and the Obradoviches have created a genuine dispute as to whether it engaged in unfair debt collection practices under § 1692f(6), the Court denies Seterus's request for summary judgment as to that claim.

## CONCLUSION

For the foregoing reasons, Fannie Mae's motion for summary judgment on its foreclosure claim (Dkt. No. 125) is granted. The motions by Counterclaim Defendants Fannie Mae, Seterus, Safeguard, and YJM for summary judgment (Dkt. Nos. 157, 160, 166) are granted in part and denied in part. Specifically, the motions are denied with respect to the Obradoviches' counterclaims of trespass. The motions are granted with respect to the counterclaims under the ICFA to the extent they are  based on deceptive conduct, but denied with respect to any counterclaims under the ICFA based on unfair conduct. All Counterclaim Defendants' motions are denied with respect to the negligence counterclaims. Finally, Safeguard and YJM's motion as to the FDCPA counterclaims and Seterus's motion as to violations of §§ 1692d, 1692e, and 1692g of the FDCPA are granted, but Seterus's motion is denied with respect to the Obradoviches' counterclaim under FDCPA § 1692f.

ENTERED:

Dated: May 28, 2020

Andrea R. Wood
United States District Judge

26